**ALASKA CENTER FOR THE ENVIRONMENT; Chesapeake Bay Foundation, Inc.; Delaware Nature Society, Inc.; Idaho Wildlife Federation; National Wildlife Federation; Nebraska Wildlife Federation; Northwest Environmental Advocates; Northwest Environmental Defense Center, Inc.; Oregon Shores Conservation Coalition; Pennsylvania Federation of Sportsmen's Clubs, Inc.; Pennsylvania Wildlife Federation; Sierra Club, Inc.; South Carolina Wildlife Federation; Tip of the Mitt Watershed Council; Virgin Islands Conservation Society, Inc.; Wildlife Federation of Alaska; and Wyoming Wildlife Federation, Plaintiffs,**

v.

**Togo D. WEST, Secretary of the U.S. Department of the Army; Joe N. Ballard, Lieutenant General, Commander of the U.S. Army Corps of Engineers, and the U.S. Army Corps of Engineers, Defendants.**

**No. A96-245 CV (JWS).**

United States District Court,
D. Alaska.

April 30, 1998.

Anthony N. Turrini, National Wildlife Federation, Anchorage, AK, for plaintiffs.

Seth M. Barsky, Gregory Page, and Mark Brown, United States Department of Justice, Washington, DC, for defendants.

*ORDER FROM CHAMBERS*

SEDWICK, District Judge.

**[Re: Motiom for Summary Judgment, Docket 33; Cross-Motion for Summary Judgment, Docket 44]**

*I. MOTIONS PRESENTED*

At docket 33, plaintiffs [1] move for summary judgment on the grounds that defendants Togo D. West, Secretary of the U.S. Department of the Army; Joe N. Ballard, Lieutenant General, Commander of the U.S. Army Corps of Engineers; and the U.S. Army Corps of Engineers' ("Corps") decision to issue Nationwide Permit for Single-Family Housing 29 violates the Clean Water Act, the National Environmental Policy Act, and the Endangered Species Act. At docket 44, the Corps cross-moves for summary judgment. Oral argument was heard on April 3, 1998.

*II. BACKGROUND*

**A. Permit Program**

Section 404(a) of the Clean Water Act ("CWA") authorizes the Corps [2] to issue permits "for the discharge of dredged or fill material into navigable waters." 33 U.S.C. § 1344(a). Each disposal site for which the Corps issues a permit must be specified in accordance with guidelines developed by the Administrator of the Environmental Protection Agency in conjunction with the Corps. 33 U.S.C. § 1344(b). The Corps may issue both individual and general permits.

Individual permits are processed on a case-by-case basis. Evaluation of an individual permit application requires completion of a multi-step iterative examination process, 40 C.F.R. § 230.5. No individual permit will be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact...." 40 C.F.R. § 230.10(a). Copies of individual permit applications are available to the public, 33 U.S.C. § 1344(*o*), and the Fish and Wildlife Service is expected to review and comment upon individual permit applications. 33 U.S.C. § 1344(m).

A general permit may be issued only "if the Secretary determines that the activities in [a particular] category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).[3] General permits must be consistent with guidelines issued by the Administrator of the Environmental Protection Agency pursuant to 33 U.S.C. § 1344(b)(1) and are not directly subject to the best practicable alternative analysis re-

1. Plaintiffs are a large group of environmental advocacy groups from around the country: Alaska Center for the Environment; Chesapeake Bay Foundation, Inc.; Delaware Nature Society, Inc.; Idaho Wildlife Federation; National Wildlife Federation; Nebraska Wildlife Federation; Northwest Environmental Advocates; Northwest Environmental Defense Center, Inc.; Oregon Shores Conservation Coalition; Pennsylvania Federation of Sportsmen's Clubs, Inc.; Pennsylvania Wildlife Federation; Sierra Club, Inc.; South Carolina Wildlife Federation; Tip of the Mitt Watershed Council; Virgin Islands Conservation Society, Inc.; Wildlife Federation of Alaska; and Wyoming Wildlife Federation.

2. The statute refers to the Secretary of the Army acting through the Chief of Engineers, who is the head of the Corps. 33 U.S.C. § 1344(d).

3. General permits may be issued for a period of no more than five years and may be issued "on a State, regional, or nationwide basis." 33 U.S.C. § 1344(e).

quired for the issuance of individual permits. 40 C.F.R. § 230.7(b)(1). Where a general permit applies to a proposed fill, "the applicant needs merely to comply with its terms, and no further action by the [Corps] is necessary." 40 C.F.R. § 230.5(b). States may apply for the authority to issue individual and general permits for the discharge of fill into certain navigable waters within their jurisdictions. 33 U.S.C. § 1344(g).[4]

On November 22, 1991, the Corps published thirty-six general permits applicable nationwide. A Nationwide Permit for Single–Family Housing (known as NWP 29) was added on July 27, 1995. In 1996, the Corps determined to reissue the nationwide permits, some with modifications, and to issue two new nationwide permits. NWP 29 was one of the reissued nationwide permits. (AR Vol. I, tab 7)

**B. NWP 29**

On July 15, 1996, plaintiffs filed this action challenging the Corps' decision to issue the original version of NWP 29. On December 10, 1996, the Corps issued "Decision Document Nationwide Permit No. 29" (AR Vol. I, tab 5) ("Decision Document") pertaining to the modification and reissuance of NWP 29. On December 13, 1996, the Corps published notice of the reissuance of a slightly modified NWP 29 in the *Federal Register.* (AR Vol. I, tab 7) Thereafter, the court granted plaintiffs' motion for leave to file a supplemental complaint challenging reissued NWP 29.

In the Decision Document, the Corps concluded that NWP 29 would not have more than minimal individual and cumulative environmental impacts. The Corps also concluded that issuance of NWP 29 would not have a significant impact on the quality of the human environment and that preparation of an Environmental Impact Statement was not required. As explained in the Decision Document, NWP 29 authorizes placement of fill material into non-tidal waters, including nontidal wetlands, for construction or expansion of single family homes and associated improvements only if the following criteria are met:

(1) Placement of fill does not cause loss of more than½ acre of non-tidal waters including wetlands;

(2) Permittee notifies the district engineer;

(3) Permittee takes all practicable actions to minimize impacts;

(4) Placement of fill is part of a single and complete project;

(5) Placement of fill will not cause an aggregate total loss of more than½ acre for the entire subdivision if the subdivision was created after 11/21/91;

(6) Permit may only be used in connection with single-family homes used as a personal residence;

(7) Permit may only be used once per parcel;

(8) Permit may not be used in conjunction with NWP 14, NWP 18 or NWP 26 for any parcel; and

(9) Permittee maintains sufficient vegetated buffers between the fill and open water bodies to preclude erosion or sedimentation.

(Decision Document at p. 1) In addition to the preceding specific criteria, use of NWP 29 requires compliance with the general conditions applicable to NWPs. 61 *Fed.Reg.* 65920.

The Supplemental Complaint alleges that NWP 29 was issued in violation of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.;* the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.;* and the Endangered Species Act ("ESA"), 16 U.S .C. § 1531 *et seq.* Plaintiffs allege that NWP 29 harms plaintiffs by depriving them of procedural opportunities to participate in the individual permitting process, and by threatening significant harm to the environment through adverse impacts on waters, including wetlands which provide habitat for threatened and endangered species.

4. The states may not acquire authority over waters which "are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce...." 33 U.S.C. § 1344(g)(1).

### III. DISCUSSION

**A. How NWP 29 Operates**

To make use of NWP 29, a person wishing to fill water or wetlands in order to construct or expand a single family home must comply with all nine of the specific criteria the Corps has made applicable to NWP 29. The second criterion requires the permittee to give notice to the Corps' local District Engineer of the proposed placement of fill. The notice is called a preconstruction notice ("PCN").[5] Among other things, the PCN must be given prior to placement of any fill, and it must provide a brief description of the proposed project and include a delineation of any affected wetlands.

The PCN triggers a review of the proposed fill by the District Engineer which plays a crucial role in the operation of NWP 29. The Corps relies on the District Engineer's review of PCNs to assure that NWP 29 has only minimal adverse impacts on the environment: "The preconstruction notification requirement will allow the district engineer to ensure that individual and cumulative adverse environmental effects of the NWP are minimal." (Decision Document at p. 7) The Corps also relies on the District Engineers' review of PCNs—along with the District Engineer's ongoing local-level coordination with the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS")—to assure that the Endangered Species Act is not violated:

> Information developed, shared and used by the local Corps and FWS/NMFS offices result in the Corps becoming aware of potential adverse affects on ESA species. *** Moreover, this NWP involves a level of potential impacts that require a PCN process of coordination with the other agencies, the Corps is now specifically requesting any information that the FWS or NMFS may have on endangered species as part of the PCN consultation. *** Any information provided through the PCN process will be used by the district to make its may affect, not likely to adversely affect or no affect decision.

(Decision Document at p. 12)

If, upon reviewing a PCN, the District Engineer determines that the activity will result in more than minimal adverse effects, the project is not authorized under NWP 29, and the applicant may be directed to proceed with an Individual Permit ("IP"). If the District Engineer determines that the adverse effects are minimal and that the project meets the terms and conditions imposed by NWP 29, the prospective permittee will be notified and may begin fill activities. If the District Engineer does not respond to the PCN within 30 days, the prospective permittee may commence placement of fill.

The PCN notice and ensuing review displays many of the earmarks of an individual permit program. However, the review triggered by a PCN submitted pursuant to NWP 29 differs from the review undertaken when an IP application for authorization to place fill is presented to the Corps in three important ways. First, when processing an IP, the District Engineer gives public notice of the permit application and entertains public comments; no public notice is given when the District Engineer receives a PCN. Second, an IP may not be approved if there is a practicable alternative with less adverse impact. Third, if the District Engineer does not respond to a PCN within 30 days, the permittee may commence placement of the fill; the applicant for an IP may not proceed until his permit application has been approved.

**B. Standing**

■ Initially, the Corps questioned whether plaintiffs had standing to litigate their claims, but subsequently, the Corps conceded that, with the possible exception of the claims predicated on the ESA, plaintiffs had demonstrated interest-injury standing. *Amicus curiae* have argued that plaintiffs lack Article III standing, because they have suffered no injury in fact. To have standing in a federal court, a plaintiff must demonstrate three

5. A PCN is also required for other NWPs. The information required for a PCN under the various NWPs, including NWP 29, is set out in General Condition 13 of the NWP Conditions at 61 *Fed.Reg.* 65920–22.

things. First, the party must allege harm which is concrete rather than merely conjectural. Second, the harm must be caused by the conduct of which plaintiff complains. Third, the relief requested must be capable of redressing the harm. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1016–1017, 140 L.Ed.2d 210 (1998).

Plaintiffs' Supplemental Complaint alleges that their members live in and around waters and wetlands affected by NWP 29 and enjoy the presence of threatened and endangered species which dwell therein. (Docket 25 at para. 25) Plaintiffs have submitted affidavits which support the allegations in the complaint. (*See* exhibits submitted attached to pleadings at dockets 46 and 56.) The threatened harm to plaintiffs—the filling of wetlands which they use—is concrete and not merely conjectural; wetlands are being and will continue to be filled pursuant to NWP 29. Injunctive relief would redress the harm threatened to plaintiffs' interests. There is no doubt that plaintiffs have established the existence of a case or controversy with respect to their CWA and NEPA claims. To have standing to pursue their ESA claims, plaintiffs must show that NWP 29 threatens species protected by the ESA. The court agrees with plaintiffs that the Corps' Decision Document provides a sufficient basis to support the conclusion that protected species are threatened by NWP 29, because it acknowledges that NWP 29 will impact threatened and endangered species. (Decision Document, matrix at p. 7) Although the court finds that plaintiffs do have standing to pursue their ESA claims, the Corps' supplemental memorandum at docket 60 suggests that their standing may be limited in terms of the extent of equitable relief which it might support. Because this order does not reach the merits of the ESA claims and affords no relief based upon violations of the ESA, it is presently unnecessary for the court to explore the contours of plaintiffs' ESA standing and the extent to which relief would be available for any violation of the ESA.

Sometimes when a party presents a case or controversy, a federal court may nevertheless determine that the prudent administration of the judicial system is inconsistent with entertaining the claims presented. In such circumstances, a court may find that the plaintiff lacks standing. Here, the court finds no prudential considerations which militate in favor of a finding that plaintiffs lack standing. In particular, the court finds that their claims clearly fall within the zones of interests protected by the CWA, NEPA, and ESA.[6]

### C. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgement as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party need not present evidence, it need only demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548.

Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A "scintilla" of evidence is insufficient to create a factual dispute for purposes of summary judgement. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nor do mere allegation and speculation create a genuine issue of material fact. *Nelson v. Pima Community College,* 83 F.3d 1075, 1081–82 (9th Cir.1996). The non-moving party must show that there is sufficient evidence supporting the claimed factual dispute to require

6. *Amici* also argue that plaintiffs' claims are not ripe, saying that the litigation should not proceed except in the context of a particular placement of fill authorized by NWP 29. This argument overlooks the essence of NWP 29 whose operation eliminates public notice of individual discharges and effectively denies plaintiffs any realistic opportunity to stop placement of fill before irremedial harm occurs. The controversy framed by plaintiffs' Supplemental Complaint is ripe for review, because there is no undeveloped fact necessary to disposition of the claims raised. Moreover, deferring review threatens the very harm plaintiffs seek to avoid.

a fact-finder to resolve the parties' differing versions of the truth at trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. There is no genuine issue of material fact when the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**D. Reviewing Agency Decisions**

Much of plaintiffs' challenge rests on the proposition that the Corps' review of the facts was incomplete, inaccurate or inadequate to support its conclusions. In such circumstances, this court must employ the highly deferential arbitrary and capricious standard of review. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1331 (9th Cir.1992). Plaintiffs' challenge rests in part upon the Corps' legal conclusion that it may properly assure minimal adverse environmental effect through the mechanism of the PCN review. To the extent that the PCN mechanism is used to comply with the requirements of 33 U.S.C. § 1344(e) of the CWA, the court must review the Corps' decision with the deference due an agency interpreting a statutory program which Congress has directed it to administer. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (recognizing that where there is uncertainty about a statute's application "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

With respect to the challenges under ESA and NEPA, *Chevron* deference is inapplicable, because administration of ESA and NEPA has not been entrusted to the Corps. Where *Chevron* deference is not applicable and an agency's conclusion is predominately legal in character, as contrasted to one resting on fact finding or technical expertise, a reasonableness standard of review applies. *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660 (9th Cir.1998); *Alaska Wilderness Rec. & Tourism v. Morrison,* 67 F.3d 723, 727 (9th Cir.1995).

NEPA is intended to assure that federal agencies consider the environmental consequences of their actions. It has been characterized as a statute which imposes procedural "action forcing" obligations on federal agencies, but it does not dictate a particular result. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). It follows that when measuring compliance with NEPA a court looks to see that adequate consideration has been afforded environmental consequences, rather than to see that the decision ultimately taken is in some objective sense correct.

**E. National Environmental Policy Act**

Under NEPA, a federal agency is required to prepare an environmental impact statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To determine whether a proposed action significantly affects the quality of the human environment, the federal agency prepares an environmental assessment ("EA"). 40 C.F.R. § 1501.4. An EA is "a concise public document ... that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). An EA must "include brief discussions of the need for the proposal, of alternatives as required by § 1002(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* at § 1508.9(b). If the agency concludes in the EA that the proposed action will not significantly affect the environment, the agency is not required to prepare an EIS, but instead prepares a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1508.13.

The Decision Document recites that it is the EA for NWP 29. (Decision Document at p. 1) Its discussion of NEPA alternatives is set forth in section 4(b) entitled "NEPA Alternatives." The Decision Document concludes that NWP 29 will not have a significant impact on the quality of the human environment. Pursuant to this determination, the Corps issued a FONSI. Plaintiffs

argue that the Decision Document failed to adequately consider alternatives; and that the Decision Document failed to adequately consider cumulative impacts.

"An agency's consideration of alternatives is adequate 'if it considers an appropriate range of alternatives, even if it does not consider every available alternative.'" *Resources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1307 (9th Cir.1993) (quoting *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1180–81 (9th Cir. 1990)). The range of alternatives is determined by the nature and scope of the proposed action and an agency must set forth those alternatives necessary to permit a reasoned choice. *Alaska Wilderness Rec.,* 67 F.3d 723 at 729.

Plaintiffs argue that the Corps violated NEPA by failing to give adequate consideration to the no-action alternative, the option to issue no general permit for single-family housing. The Decision Document explains that the no-action alternative would not advance the Corps' purpose to reduce the regulatory burden on applicants. (Decision Document at 4) An agency is not required to give an alternative significant consideration if it is contrary to the purpose of the project. *City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986) (explaining that "[w]hen the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved"). The Decision Document also explains that the no-action alternative would "take resources away from the Corps' ability to pursue the current level of review for other activities with more environmental effects" and notes that in the absence of a nationwide permit, the Corps' district offices would probably attempt to create regional general permits which would result in inefficient, impracticable, and inconsistent action. (Decision Document at 5) Finally, the Decision Document observes that NWPs encourage applicants to design their projects so they meet the terms and conditions of the pertinent NWP, terms and conditions which are designed to minimize environmental impact. *Id.* The discussion of the no-action alternative is adequate to show that its rejection was neither arbitrary and capricious nor even unreasonable.

Plaintiffs argue that the Decision Document is inadequate because it does not consider the alternatives of reducing the one-half acre ceiling and excluding high-value waters. As plaintiffs point out, these alternatives were suggested by many of those who commented on the proposed NWP, and they are self-evidently logical alternatives, especially the alternative of excluding high-value waters. Curiously, the Corps' first response to this argument is an assertion that plaintiffs "concede that Defendants considered the two alternatives." (Docket 44 at p. 55) The court does not read plaintiffs' briefing to have conceded the point.

The Corps' second response is that it did consider the two alternatives at pages 4 through 6 of the Decision Document and in 61 *Fed.Reg.* 65898 (1996). This court has examined the entire Decision Document with particular emphasis on the portion cited by the Corps, as well as the publication in the *Federal Register* looking without success for some meaningful discussion of why the acreage limitation should not be smaller and why high-value waters should not be excluded. There is none.[7]

It follows that the Decision Document is not an adequate EA. The remedy for an

7. The Corps did discuss one of the alternatives when it issued the original version of NWP 29 in 1995. 60 *Fed.Reg.* 38650–51. There, the Corps discussed both higher and lower acreage ceilings (as well as tying the acreage ceiling to the amount of uplands possessed by the prospective permittee) and provided a reasoned basis for using the one-half acre ceiling for activities that could be authorized through the NWP. If the 1995 publication were part of the EA for the Corps' 1996 reissuance of a modified NWP 29 (plaintiffs did acknowledge at oral argument that both the 1995 publication in the *Federal Register* concerning issuance of original NWP 29 and the 1996 publication in the *Federal Register* concerning reissuance of NWP 29 are properly considered part of the administrative record in this proceeding), there would be no NEPA violation for failure to discuss acreage alternatives, because the 1995 publication does an adequate job. However, it is inconsistent with 40 C.F.R. § 1508.9(a)(1) to graft an extraneous document into the EA, particularly where the EA does not even reference the earlier document.

inadequate EA must include a remand of the matter to the agency for further proceedings. The court must also address the question of how the Corps should deal in the meantime with persons who seek permission to place fill material for activities within the scope of NWP 29.

### IV. EQUITABLE RELIEF

Plaintiffs have alleged facts which, if true, show that the implementation of NWP 29 may significantly affect the human environment through the degradation or destruction of wetlands. The Corps has failed to explain why it could not have excluded high value-waters from the reach of NWP 29. Under these circumstances injunctive relief may be appropriate. *See Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir.1988). However, it does not automatically follow that an injunction against use of NWP 29 should issue. As the Ninth Circuit has explained, even where an agency has acted in violation of NEPA, it is necessary for a court to consider the "balance of harms" before issuing an injunction. *Alaska Wilderness Rec.*, 67 F.3d at 732.

Here, the potential harm to the environment which will occur if a fill is placed in high-value waters is serious and likely irreversible. Placement of fill is not something whose effects can be easily undone. On the other hand, the potential harm to the Corps and persons seeking to place fill for the construction of single family homes which would result if NWP is suspended and the PCN mechanism is replaced by the use of IPs would not be so great. The benefit of NWP 29 is the reduction in permit processing time. Without NWP 29, the average processing time for a single-family home IP would presumably approximate the pre-NWP 29 experience of just over 100 days. 60 *Fed.Reg.* 38660. With NWP 29 in place, the processing time would presumably be under the 30 days allowed for action by the District Engineer. The difference is on the order of 70 days. However, "some single-family housing activities could qualify for either NWP 18 or NWP 26. For example, NWP 18 could authorize 0.1 acre of fill in any wetland; NWP 26 could authorize up to 10 acres of fill in a wetland above the headwaters or an isolated wetland." 60 *Fed.Reg.* 38659. In short, the consequences of enjoining use of NWP 29 are that (1) some, but not all, persons seeking to place fill to construct or expand a single-family house would have to go through an IP process which would take an extra 70 days, and (2) the Corps would have to expend some portion of its resources in excess of the resources required to operate NWP 29 on single family home IPs. The record does not disclose any measure of those resources, but it is apparent that with 37 NWPs in place, loss of the ability to use one NWP, even if it is an important one, is not of consequence sufficient to outweigh irreversible harm to the environment. After considering all the circumstances, the court concludes that the balance of harm favors enjoining the operation of NWP 29 until such time as the Corps provides a reasoned explanation why excluding high-value waters is not a reasonable alternative and an acreage ceiling lower than 0.5 acres should not be employed.

In framing an injunction there is another consideration which must be addressed. It is the impact of an injunction on persons who have already submitted PCNs or who have taken significant steps in preparation to do so. Many such persons may have hypothecated their property or otherwise made significant decisions in reliance upon the ability to proceed with dispatch under NWP 29. At any given time there would only be a limited number of PCNs before the Corps. The risk to the environment from allowing NWP 29 to operate on a limited number of PCNs—especially in light of the fact that a PCN does trigger a review by the District Engineer—is substantially less than the risk to the environment from the operation of NWP 29 for an unlimited period of time. With these things in mind, the court concludes that it is appropriate to provide for an orderly suspension of NWP 29 rather than an abrupt halt. The court concludes that the Corps should be enjoined from accepting PCN's pursuant to NWP 29 after June 30, 1998, pending compliance with NEPA through the issuance of an EA which adequately addresses the exclusion

of high-value waters and the use of an acreage ceiling other than 0.5 acres.

### *V. OTHER ISSUES NOT ADDRESSED*

The court has considered the advisability of addressing the other arguments raised by plaintiffs in their challenge to NWP 29, but has decided not to do so for three reasons: First, there is a realistic chance that the Corps will decide to exclude high-value waters from NWP 29, which would likely have a significant impact on resolution of the other arguments. Second, even if the Corps does not decide to exclude high-value waters and not to alter the 0.5 acre ceiling, its explanation of the reasons that such alternatives are unreasonable may shed considerable light on some, if not all, of the other disputed issues. Third, the Corps has commenced interagency consultations pursuant to the ESA which may result in changes to NWP 29 or to the circumstances in which it operates during the pendency of the remand.

### *VI. CONCLUSION*

The motion at docket 33 is **GRANTED IN PART** in that the EA is inadequate for failing to address the exclusion of high-value waters and lesser acreage ceilings, **DENIED IN PART** with respect to the argument that the EA did not adequately address the no-action alternative, and **DENIED WITHOUT PREJUDICE** to renewal upon completion of remand proceedings as to all other issues. The motion at docket 44 is **GRANTED IN PART** in that the EA adequately addressed the no-action alternative, **DENIED IN PART** in that the EA failed to address the exclusion of high-value waters and lower acreage ceilings, and **DENIED WITHOUT PREJUDICE** to renewal upon completion of remand proceedings as to all other issues.

This action is **REMANDED** to the Secretary of the Army with instructions to consider exclusion of high-value waters from NWP 29 and the use of lesser acreage ceilings in NWP 29 and to set forth his disposition of such considerations in an amended EA. In the exercise of his discretion, the Secretary may elect to withdraw NWP 29; or if completion of the EA process shows it to be appropriate, the Secretary may prepare an Environmental Impact Statement for NWP 29.

Pending completion of proceedings on remand, the Corps is **ENJOINED** from accepting PCNs pursuant to NWP 29 after June 30, 1998, until such time as this court may otherwise order. No authorization to fill waters of the United States shall be valid if based upon a PCN presented to the Corps after June 30, 1998, for processing under NWP 29 pending further order of this court.

Nothing in this order prohibits the Corps from processing PCNs to place fill for purposes of construction or expansion of a single-family house or attendant feature under NWP 18, NWP 26 or any other NWP except NWP 29. Nothing in this order prohibits the Corps from processing an individual permit application for construction or expansion of a single-family house or attendant feature. Nothing in this order limits interagency consultations pursuant to the ESA.