OHIO VALLEY ENVIRONMENTAL COALITION, Coal River Mountain Watch, and Natural Resources Defense Council, Plaintiffs,

v.

William BULEN, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District, and Robert B. Flowers, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers, Defendants.

No. Civ.A.3:03–2281.

United States District Court, S.D. West Virginia, Huntington Division.

July 8, 2004.

John W. Barrett, Appalachian Center for the Economy and the Environment, Charleston, WV, for Plaintiffs Coal River Mountain Watch, Natural Resources Defense Council, and Ohio Valley Environmental Coalition.

Joseph M. Lovett, Appalachian Center for the Economy and the Environment, Charleston, WV, for Plaintiffs Coal River Mountain Watch, Natural Resources Defense Council, and Ohio Valley Environmental Coalition.

James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, for Plaintiffs Coal River Mountain Watch, Natural Resources Defense Council, and Ohio Valley Environmental Coalition.

Terry Clarke, United States Army Corps of Engineers, Huntington, WV, for Defendants Robert B. Flowers and William Bulen.

Russell W. Petit, United States Army Corps of Engineers, Washington, DC, For Defendants Robert B. Flowers and William Bulen.

Kasey Warner, United States Attorney's Office, Charleston, WV, for Defendants Robert B. Flowers and William Bulen.

Michael L. Keller, United States Attorney's Office, Charleston, WV, for Defendants Robert B. Flowers and William Bulen.

Cynthia J. Morris, United States Department if Justice, Washington, DC, for Defendants Robert B. Flowers and William Bulen.

Steven E. Rusak, United States Department if Justice, Washington, DC, for De-

fendants Robert B. Flowers and William Bulen.

Ruth Ann Storey, United States Department if Justice, Washington, DC, for Defendants Robert B. Flowers and William Bulen.

Thomas L. Sansonetti, United States Department if Justice, Washington, DC, for Defendants Robert B. Flowers and William Bulen.

Robert G. McLusky, Jackson Kelly, Charleston, WV, for Defendants Coal Operations and Associates, Inc., Kentucky Coal Association, National Mining Association, Ohio Coal Association, West Virginia Coal Association, and Green Valley Coal Association.

James R. Snyder, Jackson Kelly, Charleston, WV, for Defendants Coal Operations and Associates, Inc., Kentucky Coal Association, National Mining Association, Ohio Coal Association, West Virginia Coal Association, and Green Valley Coal Association.

Lindsey K. Zamonski, Jackson Kelly, Charleston, WV, for Defendants Coal Operations and Associates, Inc., Kentucky Coal Association, National Mining Association, Ohio Coal Association, West Virginia Coal Association, and Green Valley Coal Association.

### MEMORANDUM OPINION AND INJUNCTIVE ORDER

GOODWIN, District Judge.

Pending before the court are the plaintiffs' Motion for a Preliminary Injunction and/or Summary Judgment on All of Their Claims [Docket 43], the Intervening Mining Associations' Motion to Dismiss [Docket 21] and Cross–Motion for Summary Judgment [Docket 91], and the United States' Motion for Judgment on the Pleadings [Docket 30] and Cross–Motion for Summary Judgment [Docket 95]. For the reasons stated below, the court FINDS that this case is ripe for adjudication, that the plaintiffs have standing to challenge Nationwide Permit 21, and that all necessary parties are joined in this lawsuit. The court further FINDS that Nationwide Permit 21 does not comply with the plain language, structure, and legislative history of the Clean Water Act. Section 404(e) of the Clean Water Act authorizes the Corps to issue nationwide permits only for those activities determined *before* issuance to have minimal environmental impact. Nationwide Permit 21 requires a case-by-case, *post hoc* determination of minimal environmental impact which runs afoul of that section. Accordingly, the plaintiffs' motion [Docket 43] is hereby **GRANTED**, the Intervening Mining Associations' motions [Docket 21, 91] are **DENIED**, and the United States' motions [Docket 30, 95] are **DENIED**.

### I. Background

The purpose of the Clean Water Act (the Act), 33 U.S.C. § 1251, *et seq.*, is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* at § 1251(a). The Act authorizes the Secretary of the Army, acting through the Army Corps of Engineers (the Corps), to regulate discharges of dredged and fill material into the waters of the United States. 33 U.S.C. § 1344 (Section 404).[1] Section 404(a) of the Act authorizes the Corps to issue individual discharge permits on a case-by-case basis. *Id.* at § 1344(a). The Corps may only issue permits after notice and opportunity for public hearings. *Id.* Public notice serves as

---

1. The Act distinguishes dredged and fill materials from pollutants, which are regulated pursuant to Section 402. *See* 33 U.S.C. § 1342. For a thorough discussion of the legislative history that led to this distinction, see *Kentuckians for the Commonwealth, Inc. v. Rivenburgh,* 204 F.Supp.2d 927, 932–38 (S.D.W.Va.2002).

"the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest." 33 C.F.R. § 325.3(a) (2003). After public notice, the Corps must provide a "reasonable period of time within which interested parties may express their views concerning the permit." *Id.* at § 325.2(d)(2). Individual permitting under Section 404(a) also involves site-specific documentation and analysis, public interest review, and formal determination.

A. *Congress added Section 404(c) to the Act to alleviate the burden placed on the Corps by its expanded jurisdiction.*

Section 404(a) refers to "navigable waters." 33 U.S.C. § 1344(a). When the Act was first passed, the Corps interpreted that term to mean waters that are "subject to the ebb and flow of the tide or were, are, or could be made navigable in fact." *See* Thomas Addison and Timothy Burns, *The Army Corps of Engineers and Nationwide Permit 26: Wetlands Protection or Swamp Reclamation?*, 18 Ecology L.Q. 619, 628 (1991). In 1975, the District Court for the District of Columbia determined that Congress had asserted jurisdiction over the nation's waters "to the maximum extent permissible under the Commerce Clause of the Constitution." *Nat'l Res. Def. Council v. Callaway*, 392 F.Supp. 685, 686 (D.D.C.1975). The *Callaway* court held that the term "navigable waters" was "not limited to the traditional tests of navigability." *Id.* The court ordered the Corps to publish regulations "clearly recognizing the full regulatory mandate of the Water Act." *Id.*

The Corps resisted the expansion of its jurisdiction and complained that *Callaway* would force it to issue permits for "the rancher who wants to enlarge his stock pond, or the farmer who wants to deepen an irrigation ditch or plow a field, or the mountaineer who wants to protect his land against stream erosion." *See* Michael Blumm and D. Bernard Zaleha, *Federal Wetlands Protection Under the Clean Water Act: Regulatory Ambivalence, Intergovernmental Tension, and a Call for Reform*, 60 U. Colo. L.Rev. 695, 705 n. 56 (quoting Dep't of Army, Office of Chief of Engineers, Press Release (May 6, 1975)). During debate over the 1977 revisions to the Clean Water Act, Senator Bentsen introduced an amendment that would have explicitly preempted *Callaway* by limiting the Corps' jurisdiction to truly navigable waters and adjacent wetlands. *A Legislative History of the Clean Water Act of 1977*, at 901–02 (1978). Senator Bentsen alleged that, "Section 404 has become a symbol to many Americans of how a well-intentioned legislative initiative can turn into a quagmire of disruption, frustration, and bureaucratic entanglement for the ranchers, farmers, foresters, and average citizens of this country." *Id.* at 902. Echoing the Corps' concerns, Senator Tower stated in support of the amendment that, "[i]f we do not act affirmatively and clean up the language in [the Clean Water Act], it will result in unwarranted and despotic intrusion by the Federal Government over every brook, creek, cattle tank, mud puddle, slough, or damp spot in every landowner's backyard across this Nation." *Id.* at 931.

Senator Hart opposed the Bentsen Amendment, stating that, "There is a national and Federal interest in waterways other than those on which a ship can be floated." *Id.* at 908. Senator Chafee expressed concern that the amendment "would leave many of our Nation's ecologically important wetlands with no protection and many with uncertain protection from discharges of dredged or fill materials." *Id.* at 916. After extensive debate, the Bentsen Amendment failed. *Id.* at

947. Congress affirmed in the Clean Water Act of 1977 that the Corps' jurisdiction extended to all waters of the United States.

In revising the Act, however, Congress alleviated some of the Corps' burden by adding Section 404(e). That section authorizes the Corps to define categories of discharge activities that do not require permittees and the Corps to undergo the extensive individual permit review process of Section 404(a). The streamlined permitting process for those categories of activities was meant to reduce administrative paperwork and delay. "General permits" under Section 404(e), in contrast to individual permits under Section 404(a), allow certain activities to go forward with minimal involvement by the Corps. Section 404(e) states:

(c) General permits on State, regional, or nationwide basis

(1) In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. . . .

33 U.S.C. § 1344(e). The general permits that are national in scope are known as nationwide permits (NWPs). There are currently forty-three NWPs. According to the Corps, "[t]he NWPs authorize minor activities that are usually not controversial and would result in little or no public or resource agency comment if they were reviewed through the standard permit process." Issuance of Nationwide Permits;

Notice, 67 Fed.Reg.2020, 2022 (Jan. 15, 2002).

*B. This lawsuit concerns NWP 21.*

The nationwide permit at issue here is NWP 21, which authorizes:

Discharges of dredged or fill material into waters of the United States associated with surface coal mining and reclamation operations provided the coal mining activities are authorized by the DOI, Office of Surface Mining, or by states with approved programs under Title V of the Surface Mining Control and Reclamation Act.

67 Fed.Reg. at 2081. As reissued on January 15, 2002, NWP 21 requires that project proponents file a pre-construction notification (PCN) with the appropriate District. *See id.* at 2090. On a case-by-case basis, District Engineers consider the necessity of mitigating the effects on the environment of NWP 21 projects. *See id.* at 2081. The Corps must approve all NWP 21 projects before they can proceed to construction. *See id.* at 2090. All nationwide permits are subject to a set of General Conditions. General Condition 13(b)(7) states:

For NWP 21 (Surface Coal Mining Activities), the PCN must include an Office of Surface Mining (OSM) or state-approved mitigation plan, if applicable. To be authorized by this NWP, the District Engineer must determine that the activity complies with the terms and conditions of the NWP and that the adverse environmental effects are minimal both individually and cumulatively and must notify the project sponsor of this determination in writing.

*Id.* Of all NWPs, only NWP 21 requires written authorization from the Corps. It is the Corps' view that requiring such pre-construction authorization ensures compliance with the Clean Water Act: "In order

to ensure that appropriate mitigation is performed, and that no activities are authorized that result in greater than minimal adverse impacts, either individually or cumulatively, the revised permit also requires not only notification, but also explicit authorization by the Corps before the activity can proceed." *Id.* at 2043.

In West Virginia, the Corps authorizes NWP 21 projects for the discharge of material associated with both mountaintop coal mining and underground mining. The practice of mountaintop coal mining involves "the removal of the entire upper section of a mountain to access coal and typically involves the removal of multiple seams of coal." Intervening Mining Associations' Response and Cross–Motion for Summary Judgment (Intervenors' Response) [Docket 92] at 8. While the Surface Mining Control and Reclamation Act (SMCRA) requires mining companies to restore the mined area to its "approximate original contour," there is inevitably "excess overburden" that cannot be restored to the mined area. *Id.* Excess overburden is placed in valley fills. *Id.* Underground mining produces "excess spoil that must be placed in valley fills as well as residual rock and coal from the cleaning of the deep-mined coal that is frequently disposed of in refuse fills or impoundments." *Id.* When proposed valley fills and refuse impoundments will impact waters of the United States, they must be authorized by the Corps pursuant to NWP 21 or receive an individual permit under Section 404(a).

The plaintiffs here are a collection of environmental groups. They claim that the Corps' issuance of NWP 21 was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law" because NWP 21 does not comply with the Clean Water Act in several respects. Amended Complaint [Docket 25] at ¶¶ 52–55. They also claim that the Corps failed to comply with the National Environmental Protection Act when issuing NWP 21. *Id.* at ¶ 56. The plaintiffs have identified eleven [2] projects approved by the Corps pursuant to NWP 21 since March 2002. *See* Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction and/or Summary Judgment on All of Their Claims (Plaintiffs' Memo) [Docket 44] at 4–11. They move the court to enjoin new or expanded fills at these eleven sites that had not begun as of April 9, 2004. *Id.* at 66. I will describe those projects briefly, relying on information provided by the United States.

The Green Valley Revision 5 project, which was the subject of a prior motion for preliminary injunction, would have impacted 431 linear feet of waters of the United States. Revision 5 is by far the smallest project challenged in this lawsuit.[3] The Horse Creek Surface Mine project will involve the construction of four valley fills and associated sediment ponds, and will impact approximately 12,116 linear feet of waters. *See* U.S. Memo at 65–66. The Synergy Surface Mine No. 1 project will involve the construction of four valley fills and associated sediment ponds, and will impact approximately 6,933 linear feet of waters. *Id.* at 69. The Hardway Branch

**2.** The plaintiffs originally identified twelve projects, but one, the Cherry Tree Refuse Facility, is no longer at issue. *See* United States' Memorandum in Opposition to Plaintiffs' Motion and In Support of United States' Cross Motion (U.S.Memo) [Docket 96] at 68.

**3.** At a May 22, 2004, hearing on the plaintiffs' motion to enjoin the Corps from authorizing

Revision 5, the plaintiffs' expert testified on cross-examination that he could not remember a nationwide permit authorization that impacted fewer than 431 feet, and counsel for the United States stated: "I don't know, frankly, that [the Corps has] ever had a project this small proposed under NWP 21...." May 22, 2004, Hearing Transcript [Docket 101] at 144, 205.

Surface Mine project will involve the construction of three valley fills, a valley fill expansion, and two sediment ponds, and will impact approximately 8,685 feet of waters. *Id.* at 73. The Phoenix No. 3 Surface Mine project will involve the construction of three valley fills and associated sediments ponds, and will impact approximately 7,239 feet of waters. *Id.* at 76–77. The Fola Surface Mine No. 4a project will involve the relocation and reconstruction of the Right Fork of Leatherwood Creek and Rock Lick Creek and the construction of five sediment control structures, and will impact approximately 35,590 feet of waters. *Id.* at 80. The Westridge No. 2 Surface Mine project will involve construction of two valley fills, a permanent stream relocation, and the construction of two temporary sediment control structures, and will impact approximately 14,757 linear feet of waters. *Id.* at 84. The West of Stollings Surface Mine project will involve the construction of four valley fills, two permanent road crossings, one temporary road crossing, and eight associated temporary sediment ponds, and will impact approximately 12,780 linear feet of waters. *Id.* at 88. The Edwight Surface Mine project will involve two valley fills, two road crossings, and "mine through streams," and will impact approximately 8,460 linear feet of waters. *Id.* at 92–93. The Hewitt Creek Surface Mine project will involve the construction of six valley fills and six associated sediment ponds, and will impact approximately 11,250 feet of waters. *Id.* at 96. The Lexerd Surface Mine project will involve the construction of eight permanent valley fills, eight temporary sediment ponds, and a temporary "mined through area," and will impact approximately 22,521 linear feet of waters. *Id.* at 98–99.

Together, these projects will impact approximately 140,000 linear feet of waters in West Virginia.

## II. Standard of Review

The United States has moved for judgment on the pleadings, asserting that this court lacks jurisdiction to hear the plaintiffs' facial challenge to NWP 21. *See* United States' Motion for Judgment on the Pleadings (USMJP) [Docket 30]. The mining association intervenors have made the same argument. *See* Motion to Dismiss of Intervenors [Docket 21]. Both parties contend that the court lacks subject matter jurisdiction under the finality and ripeness doctrines, and that the plaintiffs lack standing to bring this lawsuit.

■ Although the United States' motion for judgment on the pleadings is brought pursuant to Federal Rule of Civil Procedure 12(c), the United States and the defendant intervenors are challenging the court's subject matter jurisdiction to hear the plaintiffs' claims. The court will therefore consider both motions in light of Federal Rule of Civil Procedure 12(b)(1). *See* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (1990) ("[I]f a party raises an issue of subject matter jurisdiction on his motion for judgment on the pleadings, the court will treat the motion as if it had been brought under Rule 12(b)(1)"). Generally, on a motion to dismiss for lack of subject matter jurisdiction, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia,* 370 F.3d 392, 398 (4th Cir.2004).

■ The intervenors further argue that, unless those coal companies currently holding authorizations to conduct activity pursuant to NWP 21 are joined as defendants here, the plaintiffs' claims must be dismissed. In deciding this motion, the court must determine whether the absent parties are "necessary" to this action un-

der Federal Rule of Civil Procedure 19(a). *See Nat'l Union Fire Ins. Co. v. Rite Aid,* 210 F.3d 246, 249 (4th Cir.2000). If they are necessary, but cannot be made parties for some reason, the court must determine whether they are "indispensable" pursuant to Rule 19(b). *Id.*

All parties have moved for summary judgment. To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

## III. Analysis

### A. The court may properly consider whether NWP 21 complies with the Clean Water Act.

■ The "basic rationale" of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In *Abbott Laboratories,* the Court announced a two-part ripeness inquiry that considered "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. The Court found that the issues presented there were fit for judicial decision because they were purely legal and because the regulation at issue was a "final agency action." *Id.* Under the Administrative Procedure Act, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. Two conditions must be satisfied for an agency action to be "final": "First, the action

must mark the 'consummation' of the agency's decision-making process-it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted).

■ Because NWP 21 requires the Corps to authorize individual projects before they can proceed, the defendants here argue that no legal consequences flow from the Corps' issuance of NWP 21. *See* Memorandum in Support of USMJP (USMJP Memo) [Docket 31] at 4 ("Thus, only if and when a Corps District issues a verification determination for a specific project under NWP 21 will there be a final and ripe case or controversy justiciable in this court.") The defendants contend that the plaintiffs cannot, therefore, bring a facial challenge to NWP 21. According to the United States, "[p]laintiffs do not have the ability to present a final and ripe case or controversy until a specific project proponent has sought and been granted authorization for a specific project under NWP 21." *Id.* at 14. Further, "[p]ermitting issues should be addressed only in the context of concrete challenges relating to specific properties and projects, rather than in the abstract context of a facial challenge to NWP 21." *Id.* at 15. The intervenors have made essentially the same argument. *See* Memorandum in Support of Motion of Intervenors to Dismiss [Docket 22] at 6 ("Plaintiffs will not suffer any potential legal injury until such time as the Corps actually authorizes specific filling operations to proceed under NWP 21"). The intervenors also contend that no challenge to an authorization under NWP 21 will be ripe until the project proponent receives water quality certifica-

tion from the State where filling will take place. *Id.* at 2–3.

In response to these assertions by the defendants, the plaintiffs have emphasized that specific projects have, in fact, been authorized by the Corps. *See* Plaintiffs' Memorandum In Opposition to USMJP [Docket 32] at 2. Those projects have received water quality certification from the State of West Virginia and, in some cases, mining companies have actually begun discharging pursuant to the authorizations.

Because several specific projects have been authorized by the Corps pursuant to NWP 21, and because those authorizations are challenged in the plaintiffs' Amended Complaint, the defendants' arguments against entertaining a facial challenge to NWP 21 simply do not apply here. Nevertheless, to address the defendants' justiciability concerns, I must determine (1) whether the issuance of NWP 21 was a final agency action subject to judicial review, and, if it was not, (2) whether I may consider the lawfulness of NWP 21 in the context of the plaintiffs' site-specific claims. For the reasons that follow, I FIND that the issuance of NWP 21 was a final agency action subject to judicial review. Further, I FIND that, even if the ripeness doctrine limited this court's jurisdiction to review of the plaintiffs' site-specific claims, such review would necessarily involve consideration of whether NWP 21 complies with the Clean Water Act.

1.  The plaintiffs' facial challenge to the issuance of NWP 21 is ripe for judicial review.

The defendants argue that NWP 21 can never be challenged facially. In so arguing, the defendants mistakenly rely on *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In *Lujan,* the plaintiff challenged the federal government's "land withdrawal

review program." 497 U.S. at 890, 110 S.Ct. 3177. The Court found that the program was "not an 'agency action' within the meaning of [APA] § 702, much less a 'final agency action' within the meaning of § 704." *Id.* As described by the Court:

> The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations ... It is no more an identifiable "agency action"-much less a "final agency action"-than a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration.

*Id.* The Court held that the plaintiff "must direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891, 110 S.Ct. 3177.

The amorphous "land withdrawal review program" challenged in *Lujan* bears no relationship to the issuance of an NWP. The issuance of an NWP is undisputably an agency action, taken after publication in the Federal Register and a period for public notice and comment. The parties' debate is over whether the action is final. For that reason, *Lujan* is simply not germane to the analysis of NWP 21.

The defendants also draw unwarranted parallels between this case and *National Association of Home Builders v. United States Army Corps of Engineers,* 297 F.Supp.2d 74 (D.D.C.2003). The court there "dismisse[d] the plaintiffs' claims for lack of jurisdiction because the agency action setting NWPs is not a final agency action subject to review." *Id.* at 76. The court found that the issuance of NWPs marks the consummation of the agency's decision-making process. *Id.* at 79. In the court's opinion, however, legal consequences did not flow directly from the

issuance of the NWPs. *Id.* The court emphasized that a party seeking to discharge dredged or fill material into waters of the United States can apply for an individual permit if it cannot avail itself of a nationwide permit. *Id.* The court also suggested that a discharger could commence a project in violation of an NWP pending the initiation of an enforcement action by the Corps. *Id.* at 81. *Home Builders* stands for the proposition that "there is no final agency action until a party is either denied an individual permit or an actual enforcement action ensues." *Id.*

While expressing no view on the correctness of the *Home Builders* decision, I note that the opinion focuses exclusively on the rights and obligations of parties seeking to discharge dredged or fill material. The court did not consider whether the act of issuing a nationwide permit might be final from the perspective of an entity seeking to prevent such discharge. *Cf. Alaska Ctr. for the Env't v. West,* 31 F.Supp.2d 714, 720 n. 6 (D.Alaska 1998). As in *Lujan,* the facts of *Home Builders* are distinguishable from the instant case in ways that significantly affected the court's ripeness analysis.

More relevant to the instant case is the Supreme Court's decision in *Ohio Forestry Association, Inc. v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). The *Ohio Forestry* plaintiffs were environmentalists seeking to challenge a "Forest Plan" that the National Forest Service had issued pursuant to the National Forest Management Act. *Id.* at 728–32, 118 S.Ct. 1665. The particular Forest Plan at issue permitted logging to take place on 126,000 acres of the Wayne National Forest in Ohio. *Id.* at 729, 118 S.Ct. 1665. In the Court's words, "[a]lthough the Plan sets logging goals, selects the areas of the forest that are suited to timber production, and determines which 'probable methods of timber harvest' are

appropriate, it does not itself authorize the cutting of any trees." *Id.* (internal citations omitted). Before permitting any logging pursuant to the Forest Plan, the Forest Service was required to do all of the following:

(a) propose a specific area in which logging will take place and the harvesting methods to be used; (b) ensure that the project is consistent with the Plan; (c) provide those affected by proposed logging notice and an opportunity to be heard; (d) conduct an environmental analysis pursuant to the National Environmental Policy Act of 1969 (NEPA) to evaluate the effects of the specific project and to contemplate alternatives; and (e) subsequently make a final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court.

*Id.* at 729–30, 118 S.Ct. 1665 (internal citations omitted).

In deciding *Ohio Forestry,* the Court reformulated the two-part ripeness analysis from *Abbott Laboratories* as a three-part test, stating that it would consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.* at 733, 118 S.Ct. 1665. Considering the first of the three ripeness factors, the Court held that delayed review would not cause the parties significant hardship. *Id.* The Court found that the Forest Plan "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* The Court's use of this example implies that, had the Forest Plan abolished the plaintiffs' legal authority to object to trees being cut, delayed review of the Plan would have caused the

plaintiffs hardship. In *Ohio Forestry*, however, the Court was influenced by the fact that the plaintiffs would "have ample opportunity later to bring [their] legal challenge at a time when harm is more imminent and more certain." *Id.* at 734, 118 S.Ct. 1665.

The same cannot be said in the context of NWP 21. The Corps is not required, before issuing an authorization pursuant to NWP 21, to provide those parties affected by the discharge with notice and an opportunity to be heard. *See id.* at 729–30, 118 S.Ct. 1665. Nor is the Corps required to conduct an environmental analysis pursuant to NEPA, or to provide affected persons the opportunity to challenge the authorization in an administrative appeals process. *See id.* These differences between Forest Plans and NWP 21 have had tangible effects on the plaintiffs here. At a hearing on the plaintiffs' prior motion for a preliminary injunction, counsel for the plaintiffs described the challenge of keeping abreast of NWP 21 authorizations:

> ... the problem, from our perspective there, is that we have no access to anything that the Corps does under the nationwide permitting process. We have fought to get information. They refuse to give it to us. They make us file FOIA requests. We have to wait 30 days to know whether a permit has been authorized or whether an activity has been authorized under the nationwide. An activity, when we finally get the administrative record, can have a mitigation plan 30 pages thick. By the time we get access to that mitigation plan and give it to an expert to look at, because we don't understand those issues very well, the project is completed.

April 12, 2004 Hearing Transcript at 70–71; *see also* Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction and/or Summary Judgment on All of Their Claims [Docket 44] at 4.

Prior to the issuance of NWP 21, the plaintiffs could expect to be apprised, through the notice and comment requirements of the individual permitting process, of potential discharges of dredged and fill material associated with surface mining. After the issuance of NWP 21, the plaintiffs have no such expectation. The plaintiffs are not afforded the opportunity to participate in the consideration of specific discharge activities. The issuance of NWP 21 has abolished the plaintiffs' opportunity to object to proposals to discharge before they are authorized, and the nature of the Corps' permitting process has made it difficult to object afterward. *See Alaska Ctr. for the Env't*, 31 F.Supp.2d at 720 n. 6 (finding that NWP 29 "eliminates public notice of individual discharges and effectively denies plaintiffs any realistic opportunity to stop placement of fill before irremedial harm occurs"). In other words, rights have been determined by, and legal consequences flow from, the Corps' issuance of NWP 21. *See Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154. To withhold consideration of a facial challenge to NWP 21 would therefore cause hardship to the plaintiffs.

Considering the second of three ripeness factors in *Ohio Forestry*-whether judicial intervention would inappropriately interfere with further administrative action-the Court found that "immediate judicial review directed at the lawfulness of logging and clearcutting could hinder agency efforts to refine its policies: (a) through revision of the Plan ... or (b) through application of the Plan in practice...." 523 U.S. at 735, 118 S.Ct. 1665. The Court stated that "the possibility that further consideration will actually occur before the Plan is implemented is not theoretical, but real." *Id.* In support of that proposition, the Court cited the "process for amending forest plans" and several administrative appeals. *Id.* at 735–36, 118 S.Ct. 1665.

"Hearing the [plaintiff's] challenge now could thus interfere with the system that Congress specified for the agency to reach forest logging decisions." *Id.* at 736, 118 S.Ct. 1665.

With regard to this factor, as with the first, the instant case is distinguishable from *Ohio Forestry*. There is no process for administrative appeal of NWP 21 authorizations. Congress's purpose in passing Section 404(e), in fact, was to empower the Corps (1) to identify a category of activities that will have only minimal effects on the environment, (2) to allow public notice and comment *before* issuing a nationwide permit, and (3) to allow those activities to proceed. In this regard, the instant case highlights the difference between a *plan*, to be implemented in the future, and a *permit*, meant to authorize activities to proceed with no additional conditions and with a minimum of future consideration. The second *Ohio Forestry* factor, therefore, weighs in favor of considering the plaintiffs' challenge to NWP 21.

Finally, in applying the third ripeness factor-whether the courts would benefit from further factual development of the issues presented-the *Ohio Forestry* Court found that review of the plaintiffs' claims regarding logging and clearcutting "would require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time." *Id.* at 736, 118 S.Ct. 1665. NWP 21 is not elaborate or technically based in the way that a Forest Plan is. NWP 21 authorizes the following, subject to certain General Conditions:

> Discharges of dredged or fill material into waters of the United States associated with surface coal mining and reclamation operations provided the coal mining activities are authorized by the DOI,

Office of Surface Mining, or by states with approved programs under Title V of the Surface Mining Control and Reclamation Act.

While the details of specific NWP 21 projects can be elaborate, the substance of NWP 21 is simple. Whether it complies with the Clean Water Act is a purely legal question that courts are well-equipped to consider.

In *Abbott Laboratories*, the Supreme Court considered whether a review of agency action was fit for judicial determination and whether withholding consideration would cause hardship to the parties. 387 U.S. at 149, 87 S.Ct. 1507. In *Ohio Forestry*, the Court refined that inquiry, asking whether delayed review would cause hardship to the plaintiffs, whether judicial intervention would inappropriately interfere with further administrative action, and whether the courts would benefit from further factual development of the issues presented. 523 U.S. at 733, 118 S.Ct. 1665. Applying those inquiries to the instant case, I FIND that withholding consideration will cause hardship to the plaintiffs, that judicial intervention will not inappropriately interfere with further action by the Corps, and that the court will not benefit from further factual development of the issues presented. Accordingly, I FIND that the issuance of NWP 21 was a final agency action and that the plaintiffs' facial challenge to NWP 21 is ripe for adjudication.

> 2. A court considering site-specific authorizations to discharge may consider whether NWP 21 complies with the Clean Water Act.

Having found that the plaintiffs' facial challenge to NWP 21 is ripe for adjudication, I need not consider the issue of ripeness further. I find it worth noting, however, that nothing of significance is at stake in the determination of whether the

plaintiffs may challenge NWP 21 facially. The construction of valley fills and surface impoundments pursuant to NWP 21 is not a mere possibility; NWP 21 is already impacting waters of the United States. The plaintiffs have cited to a study by the United States Fish and Wildlife Service estimating that hundreds of miles of streams across the Appalachian Coalfield have been filled pursuant to NWP 21. In reviewing the specific authorizations challenged in this lawsuit, which no party disputes the court's jurisdiction to review, it is certainly the case that a court may consider whether NWP 21 complies with the Clean Water Act.

In *Ohio Forestry*, as stated above, the Supreme Court concluded that the Sierra Club would have ample opportunity to challenge future site-specific applications of the Forest Plan. 523 U.S. at 733–34, 118 S.Ct. 1665. According to the Court, "[a]ny such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, *i.e.*, if the Plan plays a causal role with respect to the future, then-imminent, harm from logging." *Id.* at 734, 118 S.Ct. 1665. The Court noted that the plaintiffs there had not explained why "one initial site-specific victory (if based on the Plan's unlawfulness) could not, through preclu-

sion principles, effectively carry the day." *Id.* at 734–35, 118 S.Ct. 1665 (citing *Lujan*, 497 U.S. at 894, 110 S.Ct. 3177). The Court's implication, of course, was that one site-specific victory would, in fact, "carry the day." In *Lujan*, despite the Court's refusal to entertain a broad challenge to the poorly-defined "land withdrawal review program," the Court acknowledged that judicial intervention in the administration of laws is appropriate when a specific final agency action has an actual or immediately threatened effect. 497 U.S. at 894, 110 S.Ct. 3177. "Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns." *Id.*

In this case, there can be no question that NWP 21 "matters," or "plays a causal role with respect to" future discharges into waters of the United States. It is only because the Corps has issued NWP 21 that project proponents can discharge coal refuse into waters without first obtaining an individual permit pursuant to Section 404(a). I therefore FIND that the court has jurisdiction, now that various projects have been authorized pursuant to NWP 21, to consider whether NWP 21 complies with the Clean Water Act.[4]

---

**4.** This finding is consistent with *Wilderness Society v. Thomas*, 188 F.3d 1130 (9th Cir. 1999), the holding of which is disputed by the parties. The United States claims that the case "does not hold, as Plaintiffs contend, that a facial challenge to a Forest Plan is justiciable when the complaint also asserts site-specific challenges. On the contrary, the Ninth Circuit dismissed the facial challenge to the Forest Plan, allowing only the challenges to the site-specific grazing permits to go forward." Reply Memorandum in Support of USMJP at 4 (citing *Wilderness Soc'y*, 188 F.3d at 1134). The United States is correct that the Ninth Circuit found the plaintiffs' "general challenge to the Forest Plan" not to be justiciable. The significance of the *Wilderness Society* holding to the instant case, however,

is the court's acknowledgment that it would consider the Forest Plan's compliance with the National Forest Management Act in the context of site-specific challenges: "Because the site-specific injury to the two allotments is alleged to have been caused by a defect in the Forest Plan, we may consider whether the Forest Service complied with the Act in making its general grazing suitability determinations in the Forest Plan." 188 F.3d at 1134; *see also Wilderness Soc'y v. Alcock*, 83 F.3d 386, 390 (11th Cir.1996) (affirming that plaintiffs lacked standing to bring facial challenge to Forest Plan, but stating: "Appellees concede that appellants can challenge both the site-specific action as well as the Plan-level decision(s) underlying the specific action at

*B. The plaintiffs have standing to bring their claims.*

To demonstrate Article III standing, a "plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Services, Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The Fourth Circuit has noted that, "[i]n the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). To demonstrate an injury in fact, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Preser. v. County Comm'rs*, 268 F.3d 255, 263 (4th Cir.2001) (citation omitted).

■ The uncontroverted evidence in this case is that members of the plaintiff organizations "visit, live near, recreate near, drive by and/or fly over areas of the state that are visibly harmed by valley fills, surface impoundments, and related surface mining activities...." Plaintiffs' Memo at 12, Exhibits 37–48, 63. I FIND that the threatened injury to the plaintiffs' interests in the affected areas here is concrete and particularized: coal refuse will be discharged into waters pursuant to specific authorizations. I FIND that the threatened injury is actual and imminent, and not conjectural or hypothetical, because the Corps has already issued specific authorizations. I FIND that the injury is fairly traceable to the challenged action of the defendant, and it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Accordingly, I FIND that the plaintiffs have standing to bring this suit.

*C. Those mining companies that currently hold NWP 21 authorizations need not be joined in this lawsuit.*

■ The coal association intervenors have moved to dismiss the plaintiffs' Complaint because the plaintiffs have failed to join as defendants those mining companies that already hold authorizations pursuant to NWP 21. According to the intervenors, the mining companies are both "necessary" and "indispensable" to this action. Intervenors' Memo at 7–8 (citing Fed. R.Civ.P. 19). The plaintiffs have responded by noting that the same issue came before the court in *Kentuckians for the Commonwealth v. Rivenburgh*, 206 F.Supp.2d 782, 806–07 (S.D.W.Va.2002), *rev'd on other grounds*, 317 F.3d 425 (4th Cir.2003), where the court held that the permit holder did not demonstrate that it had a legally protected interest in the permit. "The company's expectation that the permit was issued correctly is simply an expectation and assumption, which does not and cannot bind the Corps to maintain the permit, wrongly issued." *Id.* at 807. Despite the Fourth Circuit's reversal of *Rivenburgh* on other grounds, the court's analysis of the joinder issue is correct. NWP 21 either complies with the Clean Water Act or it does not, and the permit holders' interests will not change the court's analysis of that question.

■ Further, the defendant intervenors are capable of representing the absent coal companies' interests in this litigation. A litigant may serve as a proxy for an absent party if the interests of the two are identi-

the second stage. Our opinion is dependent on that concession").

cal. *See Nat'l Union Fire Ins. Co. v. Rite Aid,* 210 F.3d 246, 251 (4th Cir.2000). The coal associations moved to intervene in this lawsuit on the following basis: "Plaintiffs seek a declaration that NWP 21 was unlawfully re-issued in 2002, and seek to enjoin further filling undertaken pursuant to NWP 21 authorizations. Such a declaration and injunction could shut down existing operations or delay new ones. There can be no doubt that the Associations have the requisite interest in the subject matter of this action." Memorandum of Law in Support of Motion to Intervene [Docket 20] at 6. The coal associations intervened in this lawsuit to argue on behalf of their members, including the members with existing operations dependent on NWP 21, and they have done so. I therefore FIND that the plaintiffs' claims need not be dismissed for failure to join the individual coal companies.

### D. *The Plaintiffs Are Entitled to Summary Judgment on Their Claim That NWP 21 Does Not Comply With The Clean Water Act.*

Courts review agency actions pursuant to the Administrative Procedure Act: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Courts are to "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law [or] ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at §§ 706(2)(A),(C). The United States Supreme Court has defined a court's role when reviewing an agency's statutory interpretation of the kind at issue here:

When a court reviews an agency's construction of the statute which it adminis-

ters, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnotes omitted). The plaintiffs' challenge to NWP 21 must be considered in light of the APA and *Chevron.*

█ For the reasons stated below, the Corps' approach to authorizing valley fills and surface impoundments pursuant to NWP 21 cannot withstand the scrutiny of the first *Chevron* question. The fundamental problem with the Corps' approach is that NWP 21 defines a procedure instead of permitting a category of activities. Section 404(e) of the Clean Water Act directs the Corps to determine that certain activities will invariably have only minimal effects on the environment. The statute unambiguously requires determination of minimal impact before, not after, the issuance of a nation wide permit. The issuance of a nationwide permit thus functions as a guarantee *ab initio* that every instance of the permitted activity will meet the minimal impact standard. Congress intended for a potential discharger whose project fits into one of those categories to

begin discharging with no further involvement from the Corps, no uncertainty, and no red tape. In issuing NWP 21, however, the Corps did not define activities that will invariably have only minimal effects; rather, NWP 21 provides for a *post hoc,* case-by-case evaluation of environmental impact. It therefore runs afoul of the statutory requirement of initial certainty. By combining features of both individual and general permitting in NWP 21, the Corps allows an activity with the potential to have significant effects on the environment to be permitted without being subject to public notice and comment or the other procedural hurdles to authorization pursuant to Section 404(a). I FIND that this procedure is prohibited by the plain language, the structure, and the legislative history of the Clean Water Act.

1.  Congress has spoken directly to the issue here through the plain language of the Clean Water Act.

■ In considering whether Congress has directly spoken to an issue, a court's first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843; *see also Kofa v. INS,* 60 F.3d 1084,

1088 (4th Cir.1995) (stating that "the first place where we must look to see if Congress has spoken to the issue with which we are concerned and whether Congressional intent in that regard is clear is on the face of the statute").

The precise question at issue here is whether the Corps violated the Clean Water Act by issuing NWP 21 without determining that the discharge of material associated with surface coal mining will have minimal environmental effects and can therefore proceed without further authorization from the Corps. The Corps does not dispute that valley fills and surface impoundments have the potential to affect the environment significantly.[5] The defendants argue, however, that the Corps guarantees minimal effects through case-by-case analysis of NWP 21 projects. With regard to NWP 21, in other words, the Corps' approach to compliance with the Clean Water Act is procedural rather than substantive. In the United States' words, "the determination of minimal adverse effects at the programmatic level was not that all valley fills and surface impoundments will have minimal adverse effects, but that all valley fills and surface impoundments that *comply with the terms and conditions of NWP 21* will have minimal adverse effects." U.S. Response at 24 (emphasis in original). One of the conditions of NWP 21, as stated above, is that the District Engineer must determine that the effects of individual NWP 21 projects will be only minimal. *See* 67 Fed.Reg. at 2090 (General Condition 13(b)(7)). Ac-

---

5.  The defendant intervenors have repeatedly emphasized that NWP 21 is unique among nationwide permits because coal mining is regulated pursuant to the Surface Mining Control and Reclamation Act (SMCRA). *See, e.g.,* Intervenors' Response [Docket 92] at 2–12, 40 (citing "the confidence that comes with the issuance of a SMCRA permit"), 43–44; Intervenors' Reply [Docket 99] at 1–2 ("SMCRA and CWA § 404 overlap in their

coverage, informational requirements, and environmental analysis"). In reissuing NWP 21, however, the Corps stated unambiguously that "the SMCRA process does not currently adequately address impacts to the aquatic environment as required under Section 404, therefore this NWP does not duplicate the mining permit process but does rely on it for help in the analysis." 67 Fed.Reg. at 2041.

cording to the defendant intervenors: "The Corps *has* made an initial and contemporaneous determination of minimal impacts. That determination relies upon a programmatic *system,* part of which *requires* a case-by-case review of pre-construction notifications." Intervenors' Response at 25 (emphasis in original).

The Corps' procedural approach to NWP 21 is unlawful. Congress empowered the Corps to issue general permits "for any category of activities ... if the Secretary determines that the activities in such category ... will cause only minimal adverse environmental effects...." 33 U.S.C. § 1344(e). Section 404(e) further requires the Corps to "set forth the requirements and standards which shall apply to any activity authorized by such general permit." 33 U.S.C. § 1344(e). Yet in the case of NWP 21, the Corps has defined neither a category of activities that will cause only minimal adverse effects nor a set of requirements and standards. Because NWP 21 is defined by future Corps analysis and approval, rather than objective requirements or standards, any proposal to discharge coal mining waste might qualify for the permit, or it might not. NWP 21 imposes no limit on the number of linear feet of a stream, for example, that might be impacted by a valley fill or surface impoundment. It does not limit the total acreage of a watershed that might be impacted. The methods that project proponents can propose to "mitigate" the effects of their discharge are seemingly infinite. The "category" of activities authorized by NWP 21, in other words, is nothing more than the collection of activities that the Corps determines, during reviews that take place long after the issuance of NWP 21, will have minimal effects. The plain language of the Clean Water Act prohibits this procedure.

2. Congress has spoken directly to the issue here through the structure of the Clean Water Act.

As stated above, the "context of the statute as a whole" helps determine the meaning of statutory language. *Robinson,* 519 U.S. at 341, 117 S.Ct. 843; *see also K Mart v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole"). In addition to failing to define a category of activities in NWP 21, the Corps undermined the permitting scheme Congress established in Section 404 of the Clean Water Act. The purpose of amending the Act to add Section 404(c) was to alleviate some of the burden imposed on the Corps by its expanded post-*Callaway* jurisdiction. After determining that a discrete category of activities will have minimal adverse effects on the environment, the Corps need not individually review projects that fit into that category. In the design of the Clean Water Act, therefore, Section 404(e) is distinguished from Section 404(a) by the absence of individual review. To issue a Section 404(e) permit that is predicated on post-issuance review and approval of particular projects is antithetical to Congress's purpose in bifurcating Section 404 into one section for individual review and one for general review. If the Corps cannot define a category of activities that will have minimal effects, absent individual review of each activity, the activities are inappropriate for general permitting. Each such activity should receive the comprehensive individual review prescribed by Section 404(a).

Section 404(a) provides the opportunity for the public to comment on proposed projects. 33 U.S.C. § 1344(a). Section 404(e) also provides the opportunity for

public comment, but only *before* the issuance or reissuance of a nationwide permit. *Id.* at § 1344(e). The statutory scheme clearly expresses Congress's intent that the Corps consider the public's concerns before making decisions about whether individual projects or categories of activities will have only minimal adverse effects on the environment. In the case of a typical nationwide permit, the public's comments are only requested and allowed at the issuance or reissuance stage, because the Corps makes that determination with regard to an entire category of activities. The public is not given the opportunity to comment on individual projects authorized pursuant to NWP 21.

NWP 21 therefore disregards Congress's intent to create two separate categories of permits, one which requires individual project review and approval by the Corps and one which does not. Further, NWP 21 eliminates public involvement in decision-making at a stage where meaningful input in the minimal impact determination is possible.

3. Congress spoke directly to the issue here during the passage of the Clean Water Act.

In answering the first *Chevron* question, courts may consider not only the statutory language and structure, but also whether Congress expressed its intent during the passage or amendment of the statute. In *Chevron*, the Supreme Court reviewed the legislative history of the 1977 amendments to the Clean Air Act to determine whether Congress had directly spoken to the precise question at issue. 467 U.S. at 851–54, 104 S.Ct. 2778. The Court agreed with the District of Columbia Circuit Court of Appeals that the legislative history, on the precise question raised by that lawsuit, was "unilluminating." *Id.* at 862, 104 S.Ct. 2778.

In both the Senate and the House of Representatives. Congress spoke directly to the issue here during the passage of the Act. On August 4, 1977, the day that the Senate passed S.R.1952 to incorporate many of the provisions of the House of Representatives' revised version of the Clean Water Act, the following exchange took place between Senator Nunn and Senator Muskie:

Senator Nunn: I believe that general permits for dredge and fill activities can help eliminate lengthy delay and administrative red tape. However, it is important that such general permits be drafted in a reasonable manner so as not to negate their usefulness. For example, the corps' proposed general permit for mining in Georgia contains a requirement that even though an activity is generally permitted, a person wishing to conduct such permitted activity must still give the corps notice 45 days in advance of conducting the activity. The corps then would have an unlimited time to approve or disapprove the activity. Thus, the corps in essence is requiring activities to be individually permitted even though it purports to generally permit the activities. Obviously, this procedure imposes burdensome and potentially lengthy delays which could severely disrupt normal mining activities. For general permits to be meaningful, it seems to me that once a general permit is obtained, it should authorize activities generally without separate approval being required before undertaking such permitted activity. Am I correct that the general permits contemplated are intended to grant permission to conduct activities without such separate approval from the corps or a State each time that activity is to be conducted, or without any more than reasonable notice?

Senator Muskie: Yes, the Senator is correct.

A Legislative History of the Clean Water Act, at 1053–54. Senator Muskie chaired the Senate Subcommittee on Environmental Pollution and co-sponsored the 1972 Clean Water Act. He was the floor manager of the Clean Water Act of 1977. The Fourth Circuit has acknowledged the important role Senator Muskie played in passing the legislation: "As Senator Muskie was the manager of the conference bill in the Senate, his comments have been given significant weight by this court in construing the Clean Water Act...." *Champion Int'l Corp. v. EPA,* 850 F.2d 182, 188 (4th Cir.1988).

Similar comments were made by Representative Ray Roberts, the Chairman of the House Committee on Public Works and Transportation, the committee that oversaw the passage of the Clean Water Act of 1977 in the House of Representatives. Representative Roberts reported to the House on December 15, 1977, with the intent of stating "for the record the understanding and intentions of the House conferees with regard to some of the matters agreed to in the conference with the Senate." A Legislative History of the Clean Water Act of 1977, at 305. He made the following comments:

> The conference report gives the Corps of Engineers authority to issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the corps determines that the activities are similar in nature, cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect upon the environment.... Where a general permit has been issued, a person performing an activity covered by the general permit should not be required to obtain permission from the Corps of Engineers before proceeding with the activity. While requiring some degree of notification of the proposed

activity may be reasonable, it would be unreasonable to require that the activity not be commenced until the corps grants its consent. This would defeat the purpose of general permits which is to avoid individual applications and review.

*Id.* at 349. The House of Representatives passed the Clean Water Act of 1977 on the same day that Rep. Roberts spoke.

These comments clearly reflect the intent expressed by Congress during the passage of the Clean Water Act that nationwide permits under Section 404(e) require a final determination of minimal environmental impact *before,* not *after,* issuance. A *post hoc,* case-by-case evaluation of minimal impact defeats this clear purpose.

4. The second *Chevron* question is irrelevant.

As quoted above, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. 2778. Because I have found that the intent of Congress is clear from the plain language of the Act, from its structure, and from its legislative history, I need not consider the second step in the Supreme Court's *Chevron* analysis. The Corps' construction of the statute cannot be permissible where it does not give effect to Congress's clearly-stated intent.

E. *The Corps is enjoined from issuing future authorizations pursuant to NWP 21, and enjoined from authorizing valley fills and surface impoundments on which construction has not begun as of the date of this order.*

The parties agree that the court has broad discretion to fashion a remedy here. The plaintiffs request that the court

enjoin the Corps from authorizing any further placements of fill material pursuant to NWP 21 in this District, and further enjoin construction on new or expanded fills at the eleven challenged sites that had not begun as of April 9, 2004. Plaintiffs' Memo at 66–67. The defendant intervenors have suggested that a more equitable solution would be to enjoin the Corps from accepting new NWP 21 authorization requests as of a date in the near future. Intervenors' Response at 69.

The District of Columbia Circuit Court of Appeals has stated that, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated-not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C.Cir.1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C.Cir. 1989)). In *National Mining Association*, the D.C. Circuit upheld the district court's injunction prohibiting the Corp from enforcing the so-called "Tulloch Rule" anywhere in the United States. 145 F.3d at 1408–10. The court quoted Justice Blackmun's dissenting opinion in *Lujan*, which the court described as "apparently expressing the view of all nine Justice on this question":

> The Administrative Procedure Act permits suit to be brought by any person 'adversely affected or aggrieved by agency action.' In some cases the 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court. On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

*Id.* at 1409 (quoting *Lujan*, 497 U.S. at 913, 110 S.Ct. 3177 (Blackmun, J., dissenting)).

The reasoning of *National Mining Association* appears to apply to this case. The Fourth Circuit Court of Appeals has held, however, that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," and that "an injunction should be carefully addressed to the circumstances of the case." *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir.2003). In *Rivenburgh*, the Fourth Circuit found the district court's injunction overbroad because the plaintiffs were entirely within the Commonwealth of Kentucky and only alleged injury in connection with one site, but the court enjoined the Corps from issuing any Section 404 permits for the disposal of waste within the Corps' Huntington District, which covers portions of five states. *Id.*

In light of *Rivenburgh*, it is apparent that the injunctive relief here should be confined to the Southern District of West Virginia. The members of the plaintiff organizations here are West Virginians, and they have established their standing to bring this lawsuit by demonstrating that they "visit, live near, recreate near, drive by and/or fly over areas of the state that are visibly harmed by valley fills, surface impoundments, and related surface mining activities" in West Virginia. Plaintiffs' Memo at 12, Exhibits 37–48, 63.

I have found that NWP 21 does not comply with the Clean Water Act. Further, I have found that it is the Corps' procedure in authorizing projects under NWP 21, rather than defects in particular authorizations, that violates the Act and

harms the plaintiffs. Accordingly, the Corps is hereby **ENJOINED** from issuing authorizations pursuant to NWP 21 in the Southern District of West Virginia. With regard to the eleven specific mining sites challenged by the plaintiffs, the Corps is **ORDERED** to suspend those authorizations for valley fills and surface impoundments on which construction has not commenced as of today, July 8, 2004.

## IV. Conclusion

The issue raised by this lawsuit is whether the Corps complied with the Clean Water Act in issuing NWP 21. I have found that it did not. Nothing in this opinion precludes any party from seeking an individual permit under Section 404(a) of the Act.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at *http://wvsd.uscourts .gov.*